**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JOSE ANTONIO AROCHI | § | |
| | § | |
|    Plaintiff/Cross-Defendant, | § | |
| | § | |
| v. | § | Case No. 1:18-cv-02266 APM |
| | § | |
| NOVAK DRUCE CONNOLLY BOVE | § | |
| & QUIGG, LLP, *ET AL.,* | § | |
| | § | |
|    Defendants/Cross-Plaintiffs. | § | |

**DEFENDANTS'/CROSS-PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
<u>THEIR MOTION FOR SUMMARY JUDGMENT</u>**

## **TABLE OF CONTENTS**

ARGUMENT ............................................................................................................. 2

    I.       AROCHI'S CLAIM UNDER THE ACT FAILS ................................. 2

           A.     The Act Did Not Apply to Arochi. ............................................. 2

           B.     Arochi was in Texas, not D.C., during the Veteria matter ......... 4

    II.      AROCHI'S BREACH OF CONTRACT CLAIM FAILS ..................... 5

           A.     Arochi was Compensated for his Share of the Veteria Billings. ............... 5

           B.     The "Review of Workforce" Document is the "Linchpin Document." ...... 7

           C.     Messrs. Amernick and Venturino Informed Arochi of the New Compensation Terms, to which he accepted ............................................. 10

           D.     Alternatively, There was no Meeting of the Minds and hence no Enforceable Contract. ................................................. 12

           E.     Arochi Failed to Perform his Contractual Duties. .................... 13

    III.    AROCHI'S FRAUD CLAIM FAILS .................................................... 13

    IV.    AROCHI'S RETALIATION CLAIM FAILS ...................................... 15

    V.     AROCHI'S UNJUST ENRICHMENT CLAIM FAILS ....................... 16

    VI.    THERE IS NO PERSONAL LIABILITY FOR THE INDIVIDUAL DEFENDANTS ................................................................. 18

CONCLUSION ....................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Cherichel v. Ergo Solutions, LLC,*
    85 F. Supp. 3d 245 (D.D.C. 2015) ..........................................................................15

*Emerine v. Yancey,*
    680 A.2d 1380 (D.C. 1996) ...................................................................................18

*Georgetown Entm't Corp. v. District of Columbia,*
    496 A.2d 587 (1985) .............................................................................................12

*Hernandez v. Data Sys. Int'l, Inc.,*
    266 F. Supp. 2d 1285 (D. Kan. 2003) ...................................................................15

*Jacobson v. Hofgard,*
    168 F. Supp. 3d 187 (D.D.C. 2016) .......................................................................14

*Malone v. Saxony Coop. Apts., Inc.,*
    763 A.2d 725 (D.C. 2000) ....................................................................................12

*Molock v. Whole Foods Market, Inc.,*
    297 F. Supp. 3d 114 (D.D.C. 2018) (Mehta, J.) ........................................12, 14, 17

*Queen v. Schultz,*
    747 F.3d 879, 409 U.S. App. D.C. 149 (D.C. Cir. 2014) .......................................12

*REO Acquisition Grp. v. Fannie Mae,*
    104 F. Supp. 3d 22 (D.D.C. 2015) ........................................................................12

*Robinson v. Shell Oil Co.,*
    519 U.S. 337 (1997) .............................................................................................15

*Strobos v. RxBio, Inc.,*
    251 F. Supp. 3d 221 (D.D.C. 2017) .................................................................2, 3, 4

*Summers v. American Psychological Ass'n,*
    766 F.3d 39 (D.C. Cir. 2014) ..........................................................................17, 18

*In re U.S. Office Products Co. Securities Lit.,*
    251 F. Supp. 2d 77 (D.D.C. 2003) ........................................................................14

**Other Authorities**

FRE 803(6)(B) .................................................................................................................8

Defendants/Cross-Plaintiffs Novak Druce Connolly Bove + Quigg LLP ("NDCBQ"), Gregory Novak ("Novak"), Tracy Druce ("Druce"), Melvin (Matt) A. Todd ("Todd"), and Burton Amernick ("Amernick") (collectively "Defendants") hereby submit this reply memorandum in support of their motion for summary judgment.

## INTRODUCTION

This dispute stems from events that began in 2013, ***over 11 years ago.*** Assuming that everything Plaintiff claims is true (which it is not), the maximum worth of Plaintiff's alleged breach of contract action is south of $120,000. Yet, as this Court knows and as shown below, Plaintiff Jose Arochi ("Arochi") has already been compensated that $120,000.[1] In his Memorandum in Support of Plaintiff Jose Arochi's Combined Opposition to Defendants' Motion for Summary Judgment and Reply in Support of his Motion for Summary Judgment ("Opposition Brief"), Arochi (a lawyer) simply ignores this fact. Instead, he and his lawyer are looking for a windfall in the millions of dollars range.

Over the last six years, Defendants have been forced to personally expend hundreds of thousands of dollars and countless hours of time devoted to dealing with this matter and thus time away from their own legal practices, not to mention the toll this case has taken on Defendants personally and professionally. All simply because Arochi has a personal vendetta against the four individual defendants. This is proven not only by Arochi's own deposition testimony, but by the fact that he chose not to sue his former firm's CFO, COO, other members of the Executive Committee, Working Group, Associate Compensation Committee, or any of the other former equity partners of the firm. Executing personal vendettas is not the appropriate use of our American jurisprudential system; indeed, it is an affront to it. While the fact that Arochi has been

---

[1] As shown below, the real amount in dispute is under $50,000.

fully compensated and he is using this Court to extract vengeance is reason enough to end this case, Defendants are entitled to summary judgment on all counts as a matter of law as there is no genuine dispute as to any material fact.

Given the pattern of conduct by Arochi and his counsel, it is no surprise that, even though the Court granted Arochi time and space to file a response to Defendants' summary judgment motion as well as a reply in support of his own summary judgment motion, he dedicated essentially none of his argument in support of his groundless summary judgment motion in his last filing. That is because he knows his case and motion are baseless.  After all of the time, effort and resources expended by Defendants, enough is enough.  In short, Arochi's vendetta has to stop; it is time for this case to come to an end.  This Court can do that by granting Defendants' summary judgment motion on all counts as is supported under the facts of this case and the law.

<u>**ARGUMENT**</u>

## I.     **AROCHI'S CLAIM UNDER THE ACT FAILS**

Arochi simply cannot escape two indisputable facts.  ***First,*** the D.C. Wage Payment and Collection Law (the "Act") did not apply to lawyers like Arochi at the relevant times of this case. And ***second,*** Arochi was working in NDCBQ's Houston office, not D.C., at the relevant times. Both facts are fatal to Arochi's claim under the Act.

### A.     <u>The Act Did Not Apply to Arochi.</u>

In their summary judgment motion, Defendants cited case law that the Act does not apply to lawyers for work that predated February 26, 2015.  *Strobos v. RxBio, Inc.*, 251 F. Supp. 3d 221, 237 (D.D.C. 2017).  Even though the *Strobos* court held that the Act does not apply retroactively, that is in essence what Arochi is left to argue.  *Id.* at 238.  There absolutely is no dispute that the work on the Veteria ITC case at NDCBQ, which is the only matter to which Arochi makes his

compensation claim, was completed prior to February 26, 2015.  In fact, the Veteria work was done in 2013 and was completed in 2014.  (SF 29, 30).  As the plaintiff in *Strobos*, like Arochi, was an exempted "professional employee" under the Act, "he therefore cannot invoke this [Act] for at least the $127,233.37 in salary and bonuses ***that stemmed from his work in 2013 and 2014*** . . . prior to February 26, 2015."  *Id.* at 237 (emphasis added).  In his Opposition Brief, Arochi simply ignores the fact that Defendants cited his own interrogatory response in their summary judgment brief:  Arochi's "rights to commissions as an originator of the client Veteria ***vested in November 2013*** when he caused the client to retain the firm."  (Defendants' summary judgment brief, Dkt. No. 148, at p. 9).  "Vested in" is virtually identical to the "stemmed from" language of the *Strobos* decision.  Regardless of the devastation of this admission, however, there is no dispute that the work that Arochi bases his claim stemmed from the Veteria work that both occurred and was billed (but not paid) in 2013/2014 (as admitted by Arochi below), just like in *Strobos*.  (SF 29, 30).

> Arochi's attempt at distinguishing *Strobos* is factually inaccurate:
>
> Although these commissions "stemmed from" work that predated the expansion of the [Act], ***unlike Strobos,*** they never materialized and were never owed to Arochi at any time prior to amendment of the Act.  Neither the amount of Arochi's commissions nor the due date were even capable of being calculated until attorneys' fees were collected…

(Arochi's Opposition Brief, Dkt. No. 156, at p. 7 (emphasis added)).  Not true.  *Strobos* involved a drug company that was attempting to develop a drug "to prevent and treat acute radiation syndrome."  *Id.* at 224.  The company had "secured an important three-year deal to develop [the drug] with the financial assistance of the U.S. Biomedical Advanced Research Development Authority (BARDA)."  *Id.* at 225.  However, after two years, in January 2014, due to an audit about concerns about the drug, BARDA began withholding its monthly checks to the company and later let its contract expire without exercising "a lucrative option" thus leaving the company

3

"in a serious financial bind *as the agency was still withholding its earlier reimbursements*." *Id.* (emphasis added).  It was impliedly clear that these withheld monthly checks/reimbursements were the basis of Strobos's claimed bonus/commission.  As such, the parties in *Strobos* did not know if or when the reimbursements would ever "materialize" or "be owed" to Strobos, just like Arochi's claim.  And yet, the *Strobos* court found that the plaintiff had no claim under the Act for work that "stemmed from his work in 2013 and 2014." *Id.* at 237.  This is precisely the result that should happen here:  this Court should grant Defendants' summary judgment motion on Count I of Arochi's Amended Complaint since his Veteria-claimed "commission" stems from work completed and billed (but not paid by Veteria) in 2013 and 2014, when the Act did not apply to lawyers like Arochi.

> **B.**        **Arochi was in Texas, not D.C., during the Veteria matter.**

Even if Arochi was somehow able to convince this Court, contrary to cited[2] precedent, to retroactively apply the Act to Arochi for the Veteria work billed in 2013 and 2014, it still would not save Arochi's claim under the Act.  That is because there is no dispute that in September 2013 through May 2014, Arochi was working in NDCBQ's Houston, Texas office, not in the firm's Washington, D.C. office.  (Dkt. No. 20, First Amended Complaint, at ¶ 14).  The work on the Veteria matter spanned from November 2013 to May 2014.  (SF 29, 30).  Therefore, even if it applied retroactively, the Act would not apply to Arochi, since he was not working in D.C. at the relevant times and thus still not save Arochi's claim under the Act.  As such, should a further ground be needed, summary judgment is appropriate here in Defendants' favor on Count I.

---

[2] *See Strobos*, 251 F.Supp.3d 221, 238 (refusing to apply the Act retroactively).

## II.     AROCHI'S BREACH OF CONTRACT CLAIM FAILS

Arochi asserts a breach of contract claim only against the law firm NDCBQ, and not against any of the individually-named defendants.  According to his First Amended Complaint, Arochi pled that he "entered into a revised contract with [NDCBQ] in April 2015."  (Dkt. No. 20 at Count II, p. 15).[3]

### A.     Arochi was Compensated for his Share of the Veteria Billings.

In their summary judgment motion, Defendants walked through Arochi's various compensation arrangements for his time at NDCBQ.  (Dkt. No. 148 at pp. 2-4, 11-14).  During the setting of Arochi's compensation in 2014, Mr. Druce wrote the following in an email:

> Folks – our arrangement with Jose [Arochi] has been 20% of the collections that originate because of him.  We have been fronting the $4k/$5k per month against that for 1 year now.
>
> We should get paid soon on Viteria (sic) (anti-venom ITC case) and will have to "true" him up.
>
> He asked to change the pay arrangement to regular salary, and I agree.  He has proven himself.  I have proposed $145k/year salary, starting April 1st.  We have some potentially large cases coming in, and I'd like to have this affective (sic) before that.
>
> I know it is late for this payroll, but can we still get him a check for April compensation?  Even if it's a "live" check?  Or whatever?

(ND000095, 4/28/2014 T. Druce email, attached hereto as **Exhibit A**).  Mr. Novak responded to Mr. Druce's email, agreeing, stating: "Let's do such.  Understand this also resolves going forward amounts such as recent 500 k FDA Deal."  (*Id.*).

Defendants explained how that $145,000 salary was calculated:  Arochi received 40% origination credit for Veteria, with the remaining 60% origination credit being split by the two ITC

---

[3] There is nothing pled about the contract consisting of a Visa Letter to the U.S. Government.  (*Id.*).

partners from the firm's Delaware office actually doing the work (not uncommon in larger law firms). (*See* ND000098, email from J. Stroud to G. Novak, attached hereto as **Exhibit B** (regarding Veteria, "[t]he origination throughout the entire case was credited to Frank DiGiovanni (30%), Jeff Eichen (30%), Jose Arochi (40%).") The Veteria billings generated from November 2013 to March 2014 equaled $524,106.40 (*Id.* "$524,106.40 of the fees were billed from inception through 3/31/2014.") Using simple math, Arochi's origination credit of 40% of that amount equaled $209,642.56. Per Arochi's initial contract, again using simple math, Arochi's 20% share of that 40% figure equaled $41,928.51. Mr. Novak's "recent 500 k FDA Deal" language is referring to the fact that, at that time, Arochi represented to the firm that another client was coming in the door for an FDA matter and would generate $500,000 in fees. (*See* **Exhibit A**). Arochi's 20% share of that figure equaled $100,000. Combining the Veteria amount to the FDA matter amount equaled $141,928.51, which was rounded up to a salary of $145,000, thus baking them into the salary.

Mr. Druce was asked about his email at his deposition by Arochi's counsel:

> Q. The next sentence reads, We should get paid soon on Veteria (anti-venom ITC case) and will have to "true" him up; correct?
> A. Correct.
>
> Q. What did you mean by that sentence?
> A. I meant that as of that date April 28, 2014, it seemed that we would get paid soon on Veteria and that was actually because Jose was saying that that would happen, and if it did occur, which was not certain, then we would have, we would have to pay him some portion to true him up according to his employment agreement at that point in time.
>
> Q. Now, did Veteria subsequently pay the firm, did it not?
> A. Yes, a very long time later.
>
> Q. **And did the true up phraseology apply to that payment by Veteria**?
> A. **No. The reason why is in the next paragraph, which is why I wrote it, is he wanted 145,000 a year instead of the Veteria payment, and that's what we actually did is the payment requirement for Veteria was extinguished, and instead the firm basically took on the risk of**

> **whether or not Veteria was going to pay,** even though people believed it would happen sooner rather than the very much later than it actually did.
>
> Q.      As you sit here today is it your testimony that Arochi explicitly surrendered his rights to commissions from Veteria?
> A.      **Yes.**

(4/12/2021 Deposition Transcript of T. Druce, attached hereto as **Exhibit C**, at p. 167, ln. 9 – p. 168, ln. 18 (emphasis added)).   Even Mr. Stroud, the author of Exhibit B, acknowledged that Veteria's 2015 payments were not covered by Arochi's original employment agreement:   "I attached Jose's originally offer letter.   It does mention a percentage deal, ***but it appears to be for collections pre-3/31/14.***"   (**Exhibit B** (emphasis added)).

Thus, Arochi had been "trued up" on the "commissions" as if Veteria had paid its bills when due.   In other words, as Mr. Druce testified under oath, NDCBQ took on the risk that the clients eventually would pay their bills and Arochi received that benefit, which is exactly what Arochi was seeking.   This is why Arochi acknowledged under this agreement that "he would be paid an annual salary of $145,000, ***but no commissions***."   Arochi's Motion to Transfer Houston Action to DC, Case No. 4:18-cv-03490, Dkt. No. 6, at p. 3 (SDTX 2018).   Not shockingly so, Arochi completely ignores these undisputed facts in his Opposition Brief.   That is because they are devastating not only to his breach of contract claim but are dispositive of his entire Complaint.

> **B.      The "Review of Workforce" Document is the "Linchpin Document."**

Suni Sukduang, deposed by Arochi's counsel in this case, was an equity partner at NDCBQ before it ceased operating as a law firm.   Mr. Sukduang is not a named defendant, has no financial stake in the outcome of this case and is an unbiased witness; if anything, Mr. Sukduang testified that he was and remains friends with Arochi.   (4/23/2021 Deposition transcript of S. Sukduang, attached hereto as **Exhibit D**, at p. 43, lns. 3-8).

In the spring of 2015, NDCBQ was going through unexpected financial difficulties stemming from an earlier merger and a working group was formed to suggest cost-cutting measures, to which Mr. Sukduang testified:

> Q.      Let me ask you, what led to the need for the working group?
>                                          [. . .]
> A.      What led to the need for the working group?  I believe there was a vote by the partnership to establish a committee for review of, again, employment, cuts or adjustments, and perhaps there were some discussions about changing how the firm was operating so that there was less bureaucracy, I'll call it.

(*Id.* at p. 65, lns. 8-9, p. 67, lns. 8-14).

Mr. Sukduang was shown the "Review of workforce: 4/9/2015" document, described to this Court by Arochi's counsel as the "linchpin document" in this case.  (**Exhibit E**, 4/28/2021 Post-Discovery Hearing, p. 3, lns. 23-25, p. 6, lns. 13-17).  This document identified that Arochi's compensation in 2015 was to be "20% of future origination collections.  No further salary." (**Exhibit F**, "Linchpin Document").  Arochi's counsel spent a large portion of Mr. Sukduang's deposition interrogating him about this document:

> Q.      Have you seen this document before?
>
> A.      Yes.
>
> Q.      And can you identify it?
>
> A.      Yes.  It is the review of workforce document dated 4/9/2015.  This is a document that was a business record of NDCBQ that was in my possession and turned over to Matt Todd or provided to counsel.[4]

(**Exhibit D** at p. 120, lns. 15-21).  Mr. Sukduang further testified that the author of the document was the working group and distributed by them to the partners for review.  (*Id.* at p. 122, lns. 4-

---

[4] Notably, in his Opposition Brief, Arochi makes no challenge as to the Review of workforce document being a business record of NDCBQ, and thus an exception to the hearsay rule, nor does he challenge its authenticity.  That is because he has no basis to do so.  The document, therefore, is admissible evidence.  FRE 803(6)(B).

13).  Mr. Sukduang then testified that this document was shown to the equity partners so as to vote

on the various cost-cutting measures proposed by the Working Group, including Arochi's

compensation arrangement for 2015:

| Q. | Do you remember, as a partner, taking a vote on certain modifications to the workforce of the firm in 2015? |
|---|---|
| A. | Yes. |

[. . .]

| Q. | Do you recall any in April of 2016 – pardon me, I apologize, April 2015. |
|---|---|
| A. | Yes. |

[. . .]

| Q. | When you – you did participate in the vote, is that your testimony? |
|---|---|
| A. | I did. |

| Q. | And in that capacity or at that time, did you have made available to you records for purposes of, let's say, consideration and vote that you said was around April 15? |
|---|---|
| A. | Yes, I did. |

| Q. | And what were those records? |
|---|---|
| A. | Like I said, there were a few records of which I maintained in my physical files that had been turned over.  There was at least the **review of workforce** and a few other documents that I don't know the Bates numbers, but I've seen them in this record. |

(*Id.* at p. 79, lns.10-13, 16-18; p. 98, ln. 11 – p. 99, ln. 3 (emphasis added)).  With regard to Arochi,

his compensation change reflected in the Review of workforce document was voted on and

approved by the partnership:

| Q. | . . .  do you recall exactly a decision being made as to Arochi? |
|---|---|
| A. | My recollection is Jose Arochi was not discussed at any point after this review of workforce document was distributed to the equity partners.  And his – ***his compensation change recommended by them was ultimately adopted by the equity partners in the partnership vote***. |

(*Id.* at p. 130, lns. 14-21 (emphasis added)).

Again, the language of this "linchpin document" of "20% of future origination collections"

is entirely consistent with the previous compensation arrangements with Arochi.  As stated above,

Arochi's previous originations (although not yet collected) already had been "baked in" to his

9

$145,000 salary for April 2014 to March 2015.  Thus, given the firm's financial condition and Arochi's lack of additional origination/production and since he already had been compensated for his previous/past originations, the language of the "linchpin document" makes perfect sense: starting in April 2015, he was to receive "20% of *future origination* collections.  No further salary."  (**Exhibit F**, "Linchpin Document").

### C.     Messrs. Amernick and Venturino Informed Arochi of the New Compensation Terms, to which he accepted.

After the partnership approved of the changes to compensation or the dismissals of certain lawyers ("it was a group effort.  It was a partnership effort" when making changes to lawyers' employment and/or compensation status.  3/31/2021 Deposition Transcript of B. Amernick, attached hereto as **Exhibit G**, p. 84, lns. 8-9), Mr. Amernick and Mr. Venturino were tasked with delivering those dour messages to the affected attorneys (associates and partners) in the Washington, D.C. office: "We always made those types of discussions and messages with at least two of us to make sure we were crystal clear on what we were talking about."  (*Id.* at p. 80, lns. 18-21).  Mr. Venturino was a member of the Working Group, so he was well aware of the compensation arrangement for Arochi for 2015 going forward.  (SF 73).  Mr. Amernick and Mr. Venturino had such a discussion with Arochi in April 2015 and, consistent with the "linchpin document," told Arochi that "he would be on future originations for matters that he brought in going forward. . .  And that such were collected."  (*Id.* at p. 179, lns.13-17).  When having this discussion with Arochi, Mr. Amernick testified that he relied on the Review of workforce document that Mr. Venturino was part of putting together in the Working Group.  (*Id.* at p. 180, lns. 1-7).  Critically, the following question and answer occurred:

Q.     Did you discuss Veteria?

A.     I did not.  There was no need to discuss Veteria.  **That was past history**.

(*Id.* at p. 88, lns.9-11 (emphasis added).[5]

> Q.    How did Arochi respond to your instructions as you gave it?
>
> [. . .]
>
> A.    Well, he did agree because he stayed on with the firm. . .  And it wasn't whether he agreed or not.  It wasn't a discussion of an offer.  This is what it was going to be. If he wanted to stay, he could stay, and if not, you know, he could take his time and find other options.

(*Id.* at p. 89, lns. 2-4, p. 91, lns. 12-13, p. 91, ln. 19 – p. 92, ln. 1).

> Q.    So to be clear: It is the Defendants' position that there was a new compensation agreement formed in April 2015, and that under that agreement, Arochi had no right to any percentage of fees collected, specifically with respect to the Veteria client; is that correct?
>
> A.    With respect to past fees, that is correct.  This – everything had to do with future origination going forward on future matters; **otherwise, he'd be double-dipping into what he was paid for previously and well-paid previously.**
>
> Q.    What is it he was well-paid for previously?
>
> A.    He was on our salary of – we looked at $145,000.  And recognize, too, that that's not the only cost to the firm.  There's expenses associated.  There were benefits, I believe, he would have gotten, like a 401 – possibly a 401 (k), medical, equipment, support staff.  We have to pay office space.  So, you know, any amount is really higher than that.
>
> It was paid, and he was basically paid and asked to be paid on a salary on the promise that very shortly – at that time in, I guess it was, 2014 – this money was going to be paid. . .  [The Veteria payment] was woefully late.

(*Id.* at p. 62, ln. 8 – p. 63, ln. 15 (emphasis added)).

The language of the linchpin document "future origination collections" is irrefutable documentary evidence that collections of the Veteria matter were not to be included in Arochi's compensation after April 2015.  The sworn deposition testimony of a neutral party (and friend of Arochi) like Mr. Sukduang bolsters this documentary evidence.  Lastly, the above-cited sworn testimonial evidence of Mr. Amernick is the final nail in the coffin regarding Arochi's contractual

---

[5] Tellingly, Arochi chose not to depose Mr. Venturino, who is not a party to this case.

claim.  As such, this Court should grant summary judgment to Defendants on Arochi's breach of contract claim.

> ### D.     <u>Alternatively, There was no Meeting of the Minds and hence no Enforceable Contract.</u>

Arochi was asked about the meeting with Messrs. Amernick and Venturino and his new compensation arrangement.  When told about the "20% of future origination collections" by Mr. Amernick, Arochi (an attorney) did not object, clarify or otherwise question the new arrangement and that Veteria had nothing to do with it:

> Q.  Did you ask them if this would include the Veteria collection?
> A.  I didn't ask for that, **no**. . .
> [. . .]
> Q.  Okay.  And so Mr. Amernick did not say the collections included Veteria, ***but you assumed that the collection included Veteria***?
> A.  ***Correct***.

(8/5/2020 Deposition Transcript of J. Arochi, attached hereto as **Exhibit H**, at p. 104, lns. 14-16, p. 106, lns. 7-10 (emphasis added)).

It goes without saying that there can be no "meeting of the minds" when one of the party's understanding of the terms is based on an "assumption" as opposed to an actual agreement:

> Under the law of the District of Columbia, an enforceable contract requires both the "intention of the parties to be bound" and also "*agreement* as to all material terms[.]"  *Id.* (emphasis added) (quoting *Georgetown Entm't Corp. v. District of Columbia*, 496 A.2d 587, 590 (1985)).  Specifically, "there must be mutual assent of each party to all the essential terms of the contract."  *Malone v. Saxony Coop. Apts., Inc.*, 763 A.2d 725, 729 (D.C. 2000) ("**This mutuality of assent is often referred to as a 'meeting of the minds.**'")  And such essential terms include terms related to payment.  *See Queen v. Schultz,* 747 F.3d 879, 884, 409 U.S. App. D.C. 149 (D.C. Cir. 2014) (citing *Rosenthal*, 573 A.2d at 370).

*REO Acquisition Grp. v. Fannie Mae*, 104 F. Supp. 3d 22, 28 (D.D.C. 2015) (emphasis added);

*see also Molock v. Whole Foods Market, Inc.*, 297 F. Supp. 3d 114, 131 (D.D.C. 2018) (Mehta, J.)

(absent agreement by both parties regarding material terms, there can be no enforceable contract).

12

The documentary and sworn testimonial evidence evince an understanding that Arochi's 2015 compensation was to be based on "future origination collections" and thus nothing to do with Veteria or any other client previously originated by Arochi.  However, giving Arochi's deposition testimony the benefit of the doubt, at best it shows that there was "no meeting of the minds" between Arochi and NDCBQ and thus no valid contract was formed.

Moreover, it is important to keep in mind that Arochi, at that time, was in fact a licensed Mexican attorney – a professional. Arochi is not a regular line "employee" who was taken advantage of by some management personnel with greater skill or more acumen.  Rather, Arochi was an attorney who did not see fit to document or confirm his alleged faulty understanding of the employment arrangement that had been made clear to him by Messrs. Amernick and Venturino. Rather than document, he decided to assume. (**Exhibit H**, at p. 104, lns. 14-16, p. 106, lns. 7-10). Arochi's failure to perform even the most basic and rudimentary duties of an attorney should not be rewarded.

Given Arochi's "assumption," there was no enforceable contract formed, and therefore summary judgment in favor of NDCBQ should be granted and Count II dismissed.

### E.  <u>Arochi Failed to Perform his Contractual Duties.</u>

Finally, as agreed to in the Offer Letter, Arochi was required to pass the Bar to hold up his end of the negotiated bargain. (*See* Dkt. No. 148, at p. 8, n. 5).  It is undisputed that Arochi never passed any bar in the United States. (SF 162, 163).  It is therefore not surprising that Arochi ignored this fact in his Opposition Brief.  But simply ignoring a fact does not alleviate Arochi from his responsibility to perform his contractual obligations.  His failure to do so provides yet another basis to grant summary judgment against Arochi on his breach of contract claim.

## III.  AROCHI'S FRAUD CLAIM FAILS

In their motion for summary judgment, Defendants pointed out that Arochi's fraud claim is duplicative of his breach of contract claim and, under the law, is not a basis for a separate fraud claim.  (Dkt. No. 148, at pp. 14-15).  Arochi has no response to what he actually alleged in his Amended Complaint:  Defendants "knowingly and intentionally made misrepresentations of material facts, and failed to disclose material facts, *relating to the revised employment agreement of April 2015 . . .*  Mr. Novak misrepresented … that [Arochi] *would be compensated pursuant to his employment agreement* at 20% of the amount paid by Veteria" and that Defendants NDCBQ, Novak and Druce made "fraudulent representations to Mr. Arochi that he *would receive his wages* when they were due."  (Dkt. No. 20 at ¶¶ 97, 98, 100 (emphasis added)).  All of these allegations sound in contract, not in the tort of fraud.  Just because in his Opposition Brief Arochi claims that these allegations "are broader than those supporting breach of contract" does not make them so.  Rather, they "merely reiterate Plaintiff's disappointment in not receiving the benefits bargained for in their oral contract" (*Molock v. Whole Foods Market, Inc.*, 297 F. Supp. 3d 114, 136 (D.D.C. 2018) (Mehta, J.)) and thus "cannot provide the basis for an independent tort" like fraud.  *Jacobson v. Hofgard*, 168 F. Supp. 3d 187, 199 (D.D.C. 2016).[6]

Finally, even if Arochi's fraud claim was not duplicative of his contract claims, Arochi has presented no evidence of intent, as required for any fraud claim to survive summary judgment. *See, e.g., In re U.S. Office Products Co. Securities Lit.*, 251 F. Supp. 2d 77, 100 (D.D.C. 2003) (a plaintiff is required to prove, *inter alia,* that a defendant "intended to deceive" plaintiff).  As such, this Court should grant summary judgment to Defendants on Count III of Arochi's First Amended Complaint.

---

[6] Arochi also attempts to point to the "Visa Letter" as some basis for its fraud claim.  This too fails as such a basis for its fraud claim was never pled.  *See* Arochi's First Amended Complaint, Dkt. No. 20, at Count III, pp. 15-16.

## IV.    AROCHI'S RETALIATION CLAIM FAILS

As Defendants pointed out, the Act does not apply to Arochi and thus there can be no claim for retaliation under the Act.  Arochi hints at, but never actually avers that, he "reasonably and in good faith" believes a retaliatory act occurred.  (Opposition Brief, Dkt. No.156 at 25).  Even though Arochi attempts to look to various cases to support his retaliation claim, none comes close to the facts of this case.  Arochi's retaliation claim is not that he got fired for complaining, for instance, of someone sexually abusing or harassing him or discriminating against him because of his sexual preference and such abusive behavior continued after he was no longer employed, like the facts in *Cherichel v. Ergo Solutions, LLC*, 85 F. Supp. 3d 245 (D.D.C. 2015).  Further, Arochi's claim is not that his former law firm was writing negative reviews about him once he became a former employee, like the facts in *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997).  Moreover, these cases cited by Arochi discuss the impact of the "retaliatory" actions taken by the employer or former employer would have on the current employees.  In this case, however, when Polsinelli filed the declaratory judgment action against Arochi in 2018 that forms the basis of his retaliation claim, ***there were no employees of NDCBQ*** as the firm had ceased operating.  So there was no "chilling effect" on such NDCBQ employees pursuing a "discrimination claim."  *Hernandez v. Data Sys. Int'l, Inc.*, 266 F. Supp. 2d 1285, 1306 (D. Kan. 2003).

Lastly, Arochi simply ignores the fact that filing a declaratory judgment action is not retaliatory nor did it deprive Arochi of any of his rights.  Arochi further ignores the fact that he filed a motion to dismiss Defendants' Texas declaratory judgment action or in the alternative, to transfer that action to this Court.  In his Opposition Brief, Arochi claims that he "did not assert his retaliation claim in the motion to dismiss decided by the [Texas] court."  (Dkt. No.156 at 26). There is no other way to put this other than it simply is belied by Arochi's own counsel's argument:

In his motion to dismiss, Arochi's counsel argued that Defendants' Texas declaratory judgment action "would constitute unlawful retaliation under the [Act]."  *See* Arochi's Motion to Dismiss, Stay or Transfer This Action and Memorandum in Support, Case No. 4:18-cv-03490, Dkt. No. 6, at p. 8 (SDTX 2018).  The Texas court observed: "On September 25, 2018, [NDCBQ's] counsel advised Arochi's counsel that his clients 'had vented about the possibility of filing a preemptive lawsuit in Houston, seeking a declaratory judgement that it did not owe Mr. Arochi money, so as to not have to litigate in D.C. once Mr. Arochi filed his complaint against them.' *Id.* ¶ 14.  Arochi's counsel advised that this would violate the anti-retaliation provision of the [Act]…"  So for Arochi to claim that "Arochi did not assert his retaliation claim" in Texas is inaccurate.  Irrespective of that, however, is that Arochi fails to address the fact that none of his rights were deprived by Defendants filing a declaratory judgment action and Arochi ignores the fact that the Texas Court did not find that filing the declaratory judgment action was retaliatory.  (*See* Dkt. No. 148, at 19).  Indeed, the Texas court did not dismiss Defendants' declaratory judgment action, but rather transferred it to this Court. (9/5/2019 Memorandum and Order, Dkt. No. 11 (SDTX 2018).  Therefore, this Court should grant summary judgment to Defendants on Count IV of Arochi's Amended Complaint.

## V.   AROCHI'S UNJUST ENRICHMENT CLAIM FAILS

Lastly, like his breach of contract claim, Arochi asserts his unjust enrichment claim (Count VI)[7] only against the law firm NDCBQ, and not against any of the individually-named defendants. Unjust enrichment "occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the

---

[7]  As Defendants pointed out in their motion for summary judgment, Count V of Arochi's First Amended Complaint is Successor Liability asserted only against Polsinelli.  After Polsinelli settled with Arochi, this count was dismissed by this Court on October 23, 2020.  (*See* Dkt. No. 95).  Arochi did not address this in his Opposition Brief so it appears there is no dispute that this Count is out of the case.

defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *Summers v. American Psychological Ass'n*, 766 F.3d 39, 45-46 (D.C. Cir. 2014). Applying the facts of this case to the law, Arochi's unjust enrichment claims fails. Arochi claims that the "benefit" he conferred upon NDCBQ was the Veteria payments of its past due bills in 2015 for work done by the firm in 2013 and 2014. But NDCBQ did not "retain" that benefit. Rather, as set forth above, when Arochi requested that he be moved into a salary of $145,000 in April 2014, the benefit of his originations of Veteria (and others) was accounted for and paid to Arochi through that salary, even though Veteria had not yet paid its bills. (*See* Section II.A, *supra*). That evidence is and remains undisputed. As such, Arochi has no claim for unjust enrichment.

Next, regarding the duplicative nature of his breach of contract claim and his unjust enrichment claim, Arochi points to this Court's decision in *Molock v. Whole Foods Market*, 297 F. Supp. 3d 114, 133 (D.D.C. 2018) (Mehta, J.) claiming that "he is permitted to pursue both claims in the alternative in the same case." (Dkt. No.156 at 26). Here is what this Court stated in *Molock*:

> It is true that, "[i]n general, a plaintiff cannot maintain an unjust enrichment claim concerning an aspect of the parties' relationship that was governed by a contract." *Rubicon Advisors, LLC,* 254 F.Supp.3d at 249. However, *at this stage*, Plaintiffs may pursue an unjust enrichment claim as an alternative theory of liability, even if they ultimately cannot recover under both claims.

*Molock*, 297 F.3d at 133 (emphasis added). The *Molock* decision occurred at the **motion to dismiss** phase, before any discovery had occurred. *Id.* The difference with this case is that discovery has been closed for over ***three years*** and is now at the **summary judgment** phase. In his Amended Complaint, Arochi's unjust enrichment claim sounds in contract: "In 2015, [NDCBQ] entered in to an agreement with Mr. Arochi, to pay him a commission only," and the alleged failure to pay him that "commission" led NDCBQ allegedly being unjustly enriched. (Dkt. No. 20 at Count VI, ¶ 117). In his Opposition Brief, Arochi points to no evidence in the record that would support his unjust enrichment claim outside of his contractual claim. (Dkt. No.156 at

pp. 26-27). "Unjust enrichment **will not lie** when 'the parties have a contract governing an aspect of [their] relation,' because 'a court will not displace the terms of that contract and impose some other duties not chosen by the parties.'" *Summers*, 766 F.3d at 46 (emphasis added) (quoting *Emerine v. Yancey*, 680 A.2d 1380, 1385 (D.C. 1996). Therefore, Arochi's unjust enrichment claim against NDCBQ fails and summary judgment should be granted on this count.

## VI.     THERE IS NO PERSONAL LIABILITY FOR THE INDIVIDUAL DEFENDANTS

Arochi has requested that this Court hold the individual Defendants personally liable for both damages and attorneys' fees for the alleged violation of the Act. (Dkt. No. 20, First Amended Complaint, at ¶ 1). In fact, the vast majority of discovery, depositions, and pleadings are directed solely to the issue of personal liability and less on the merits, or the lack thereof, of Arochi's actual claims. To that end, Defendants personally spent hundreds of thousands of dollars of their own money just to keep servers [Azure] online so that Arochi's counsel could engage in their veritable "witch hunt" to try to impose personal liability – an amount that far exceeds any possible amount that Arochi could ever seek in this matter. (8/24/2020 Hearing Transcript, attached hereto as **Exhibit I**, at p. 29, lns. 5-7) ("[N]o judge in his right mind is going to sit down and slog through this on a case that's not worth more than a half a million dollars"). To that end, counsel for Arochi eventually engaged in the following dialogue with the Court:

> Plaintiff has to prove that defendants are jointly and severally liable under the factors in the *Morrison* case out of the Circuit. That's going to be a tough tow, because we don't have any of those documents. We don't have any documents to support that other than a partnership agreement. And his law firm looks like it has no assets. So essentially if it all breaks down where it's too expensive to search Azure, **he doesn't have a case.**

(*Id.* at p. 22, lns. 14-21 (emphasis added)). As the Court is well aware, it was ultimately determined to be too expensive to search the Azure servers, in the farcical manner that Arochi proposed, and as a result, Arochi – by his own admission – has no case.

Moreover, the facts of this case do not support a finding of personal liability.  It is uncontroverted in this case that none of the individual Defendants ever told Arochi that he would be entitled to Veteria money under his new arrangement. (3/31/2021 Deposition Transcript of B. Amernick, attached hereto as **Exhibit G**, p. 88, lns. 9-11, p. 89, lns. 2-4, p. 91, lns. 12-13, p. 91, ln. 19 – p. 92, ln.1). It is also uncontroverted, as argued herein above, that Arochi merely "assumed" he would be entitled to Veteria money under the new arrangement.  (8/5/2020 Deposition Transcript of J. Arochi, attached hereto as **Exhibit H**, at p. 104, lns. 14-16, p. 106, lns. 7-10.).  Surely Arochi's faulty "assumption" cannot form the basis for imposing the millions of dollars of personal liability that Arochi is seeking.

It is also uncontroverted that none of the individual Defendants controlled Arochi's compensation, or the decisions regarding his compensation.  (ND 00010-00011, attached hereto as **Exhibit F**). All attorney compensation decisions were made by committee, and not by the individual Defendants. In this case, Arochi's only compensation decision potentially covered by the Act was made by the Working Group, as detailed above, a committee on which none of the individual Defendants served, and not by any of the individual Defendants. (Deposition Transcript of M. Todd attached hereto as **Exhibit J**, p. 116, lns. 2-8). Further, none of the individual Defendants instructed either Stransky or Preston (CFO and COO respectively) to either pay or not pay Arochi. (Deposition Transcript of B. Preston, attached hereto as **Exhibit K**, p. 79, lns. 15-22, p. 211, lns. 3-9).  Defendants produced extensive evidence proving to Arochi that Arochi's compensation was set and approved by a committee and not by any of the individual Defendants, that none of the individual Defendants personally made the decision not to pay Arochi, that none of the Defendants at any time held more than 7% of the ownership interest in the firm, that none of the Defendants ever exercised any control over Arochi or his work.  The fact that none of the

19

individual Defendants could control, nor did they even try to control, Arochi's compensation does not support a finding of personal liability under the Act.

Despite Arochi's insultingly false narrative – Defendants were not operating a pizza shop where they took the payroll to Las Vegas to gamble.  NDCBQ was a mid-size national law firm with 11 offices and, at its peak, more than 100 attorneys.  NDCBQ was run by committees, not by individuals, like most mid-size firms.  There was a Management Committee, an Executive Committee, Compensation Committees, and more.   NDCBQ had professional financial management with a COO, CFO, and consultation by Citibank Private Bank.  The four individual Defendants in this case certainly played a role in the overall management of NDCBQ and some of them even participated on Committees, but exercised far less control as individuals than Arochi would have the Court believe and which is clearly shown through the facts and testimony generated in this case.   Anyone who has ever worked for or with a national law firm would certainly understand the actual lack of individual power that one single partner, even if on a committee, could have.

Further, to hold Defendants personally liable for Arochi's claims under the Act would open the veritable "floodgates" of law firms potentially abandoning the District of Columbia or being forced into very expensive restructuring.  The precedent Arochi would have this Court set in this case would make the managing partners or the management committee of every law firm operating in the District of Columbia personally liable for wage claims no matter that they were not directly involved, or had no role in the decision, or the process, or the execution.  Similar to the very facts of this case, a Texas resident, sitting on the management committee of a Texas law firm, that has an office in the District of Columbia, could be personally liable for a violation of the Act by their firm regardless if they even knew about the alleged dispute at all or had no role in the conduct

(even where the Plaintiff might testify to the same).  The advice to every law firm that did not absolutely have to be in the District of Columbia would be to leave, and for those that had to stay in the District of Columbia, the advice would be to incorporate that office in a separate legal entity that could help to insulate the firm from such widespread (and punitive) liability – a process which no doubt could prove very expensive.

Finally, with respect to Defendant Todd, Arochi's actions in this case are particularly punitive and egregious.  Arochi seeks to impose personal liability on Defendant Todd after stating in writing not once but twice in 2016 that he knew that Defendant Todd had "…nothing to do with this" and that this matter "…has nothing to do with you." (ND 00171-00174, attached hereto as **Exhibit L**).  Arochi later testified under oath that he knew that Defendant Todd had "nothing to do with it" but sued him anyway – confirming the veracity of the 2016 emails.  (8/5/2020 Deposition Transcript of J. Arochi, attached hereto as **Exhibit H**, at p. 127, lns. 18-22, p. 128, lns. 1-7, p. 129, lns. 18-22).  Moreover, the primary reason that Defendant Todd appears to be involved in this suit is because his signature appears on Arochi's March 28, 2013, Offer of Employment Letter.  To that end, however, Arochi has conceded that the Offer of Employment Letter is, in fact, not even covered by the Act because that arrangement was extinguished in April 2014 when, at Arochi's urging, a new compensation arrangement (the $145,000 salary) was agreed to by Arochi and the firm.  (*See* Section II.A, *supra*).  In fact, no evidence has come forward in this case to date that contradicts any of Arochi's statements or testimony regarding Todd or implicating Todd in any decision or communication regarding Arochi's compensation.  To seek to impose personal liability on Defendant Todd, given the facts above, would be an outrageous miscarriage of justice and is not supported by any credible evidence in this case, just as would the imposition of personal liability on any other named individual under the evidence.

21

## **CONCLUSION**

As set forth above, it is time for this case finally to reach its painful end.  After consuming the Court's time and resources for nearly **six years**, Defendants spending hundreds of thousands of dollars of their own money, attending numerous depositions, reviewing and producing tens of thousands of pages of documents and expending countless hours of time, sweat and stress addressing the myriad of issues raised throughout this litigation, this case must come to a close. This Court can do that by granting Defendants' Motion for Summary Judgment on all counts since Defendants have shown that there is no genuine issue as to any material fact and Defendants are entitled to judgment as a matter of law.

Dated: August 2, 2024

Respectfully submitted,

*/s/Gregory V. Novak*
Gregory V. Novak for
Novak Druce Connolly Bove & Quigg LLP
and himself
Novak Druce Carroll LLP
845 Texas Street, Ste 4040
Houston, TX 77002
greg.novak@novakdruce.com

*/s/ Tracy W. Druce*
Tracy W. Druce
Novak Druce Carroll LLP 845 Texas Street,
Ste 4040 Houston, TX 77002
tracy.druce@novakdruce.com

*/s/ Melvin A. Todd*
Melvin A. Todd
Polsinelli PC
1000 Louisiana Street
Suite 6400
Houston, TX 77002
mtodd@polsinelli.com

*/s/Burton A. Amernick*
Burton A Amernick
Polsinelli PC
1401 Eye Street
Suite 800
Washington, DC 20005
bamernick@polsinelli.com

23

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and accurate copy of the foregoing Defendants'/Cross-

Plaintiffs' Reply Memorandum in Support of Their Motion for Summary Judgment was served

electronically on this 2nd day of August, 2024 to:

John M. Clifford
Clifford & Garde LLP
1828 L St., NW
Suite 500
Washington, DC 20036
jclifford@cliffordgarde.com

*/s/Gregory V. Novak*
Gregory V. Novak for
Novak Druce Connolly Bove & Quigg LLP and
himself
Novak Druce Carroll LLP
845 Texas Street, Ste 4040
Houston, TX 77002
greg.novak@novakdruce.com
