**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| JOSE ANTONIO AROCHI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 18-cv-02266 (APM) |
| | ) | |
| NOVAK DRUCE CONNOLLY | ) | |
| BOVE & QUIGG LLP, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| NOVAK DRUCE CONNOLLY | ) | |
| BOVE & QUIGG LLP, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 19-cv-02694 (APM) |
| | ) | |
| JOSE ANTONIO AROCHI, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

## I.    INTRODUCTION

This long-running dispute centers on whether Defendants—the now-defunct law firm Novak Druce Connoly Bove + Quigg, LLP ("Novak Druce") and four of its individual partners—failed to pay Plaintiff Jose Antonio Arochi, then an associate, a percentage of fees collected from a client.  Before the court are the parties' cross-motions for summary judgment.  Because there is a genuine dispute of material fact as to whether there was an agreement to pay Plaintiff a share of client fees, the court largely denies both motions.  The court, however, grants Defendants' motion

as to Plaintiff's fraud and unjust enrichment claims, as well as Plaintiff's wage claim under the D.C. Wage Protection and Collection Law against the four individual defendants.[1]

## II.    BACKGROUND

### A.    Factual Background

Plaintiff joined the law firm Novak Druce in March 2013 as an associate working primarily in a business development capacity.  The firm agreed to pay Plaintiff $4,000 per month and "20% of attorney's fees collected in excess of $20,000 per month on all matters originated by [him]."  Defs.' Resp. to Pl.'s Stmt. of Material Facts in Supp. of Pl.'s Mot. for Summ. J., ECF No. 147 [hereinafter Pl.'s SMF], ¶ 24 (alteration in original); *see* Pl.'s Resp. to Defs.' Stmt. of Material Facts, ECF No. 157 [hereinafter Defs.' SMF] ¶¶ 4, 86.[2]  Defendants Burton Amernick, Tracy Druce, Gregory Novak,[3] and Matt Todd ("Individual Defendants") were partners of the firm. Pl.'s SMF ¶¶ 5–8; Defs.' SMF ¶ 65.

As Plaintiff's tenure progressed, his compensation changed.  In April 2014, Plaintiff became a salaried employee earning $145,000 per year.  Pl.'s SMF ¶ 39.  A year later, the firm was facing financial distress and looking to cut costs, and Plaintiff's compensation was changed yet again.  Pl.'s SMF ¶¶ 70–71; Defs.' SMF ¶¶ 68–69.  The precise terms of that modification are at the heart of the parties' dispute.

According to Plaintiff, on April 17, 2015, he and Amernick, along with another partner not named in this suit, orally agreed that he would receive 20% of future fees collected from *all* clients that he originated.  Pl.'s SMF ¶ 83; Pl.'s Mot. to Substitute Decl., ECF No. 154 [hereinafter Pl.'s Subst.], Ex. 1, ECF No. 154-1, ¶ 46; *see also* Defs.' SMF ¶¶ 80, 109.  That included Veteria

---

[1] The court regrets the length of time it has taken to rule on the pending motions.

[2] Unless otherwise indicated, all citations are from the docket in *Arochi v. Novak Druce*, No. 18-cv-2266.

[3] Novak passed away during this litigation, and Druce, as Temporary Administrator Pending Contest of the Estate of Gregory Vincent Novak, has been substituted for him.  Order, ECF No. 168.

Labs, S.A. De C.V. ("Veteria"), a client that Plaintiff was at least in part responsible for bringing to the firm in November 2013. Pl.'s SMF ¶ 35; Defs.' SMF ¶ 24. Veteria had a balance of unpaid fees totaling over $500,000 as of April 2015. Pl.'s SMF ¶¶ 144, 310; Defs.' SMF ¶¶ 107–109 (Pl.'s Resp). Defendants, on the other hand, contend that the firm agreed Plaintiff would receive a percentage of fees collected only from *new* clients that he originated. Defs.' SMF ¶¶ 107–109. That meant Plaintiff would not receive any share of fees paid by Veteria after April 2015.

Notwithstanding that claimed understanding, Novak Druce continued to pay Plaintiff a percentage of fees that it received from Veteria. *See* Pl.'s Mot. for Leave to File Under Seal his Mot. for Summ. J., ECF No.117 [hereinafter Pl.'s Mot.], Ex. 46, ECF No. 117-48 [hereinafter Ledger]. Between May and September 2015, the firm paid Plaintiff $27,720.40 of which $11,361.37 was his share of Veteria payments. Ledger at 2. Then, in November 2015, Veteria paid Novak Druce the sizeable balance owed, Pl.'s SMF ¶¶ 141, 144, 147, but Plaintiff received no portion of it. Defs.' SMF ¶ 24 (Pl.'s Resp.). According to Plaintiff, his share amounted to $108,748.92. Pl.'s SMF ¶ 148.

By February 2016, Novak Druce's financial condition had grown increasingly dire. Plaintiff resigned in late February or early March. Pl.'s SMF ¶ 165. At the start of March 2016, the law firm Polsinelli, P.C. hired many of the firm's lawyers, including Individual Defendants, and Novak Druce thereafter dissolved. *Id.* ¶¶ 169–171.

### B.    Procedural History

The firm's insolvency did not end the parties' dispute. In the fall of 2018, Plaintiff made a settlement demand of Defendants for unpaid wages. Defendants in response filed a "Complaint for Declaratory Judgment" in federal court in the Southern District of Texas on September 27, 2018. Compl., *Novak Druce Connolly Bove & Quigg LLP et al. v. Arochi*, No. 19-cv-2694

(D.D.C.) [hereinafter *Novak Druce* Docket], ECF No. 1 [hereinafter *Novak Druce* Compl.]. Defendants sought as relief a declaration that they did not owe Plaintiff any further compensation. *Id.* ¶¶ 31–32, 34. But they also demanded that he "disgorge to the Firm the amounts of overpaid compensation" and pay them damages for "abuse of process." *Id.* ¶¶ 33–34.

The next day, on September 28, 2018, Plaintiff filed suit in this court against Novak Druce, Individual Defendants, and Polsinelli. Compl., ECF No. 1. Months later, he amended his complaint. First Am. Compl., ECF No. 20 [hereinafter Am. Compl.]. His pleading contained six counts, only five of which are actual claims: (1) violation of the D.C. Wage Protection and Collection Law (DCWPCL) against all defendants (Count I); (2) breach of contract against Novak Druce only (Count II); (3) fraud against all defendants (Count III); (4) retaliation in violation of the DCWPCL against all defendants (Count IV); (5) "successor liability" against Polsinelli (Count V); and (6) unjust enrichment against Novak Druce only (Count VI). *Id.* at 13–18. Polsinelli answered, *see* Polsinelli Answer, ECF No. 25, but Defendants moved to dismiss, urging this court to defer to the federal court in Texas under the "first to file" rule, *see* Defs.' Mot. to Dismiss Am. Compl., ECF No. 26. Before this court ruled, the Texas federal court transferred the *Novak Druce* matter to this district, *see* Mem. Op. and Order, *Novak Druce* Docket, ECF No. 11, after which this court denied the motion to dismiss, *see* Minute Order, Sept. 9, 2019. Eventually, Polsinelli settled with Plaintiff and was dismissed from the case. *See* Order, ECF No. 95; Pl.'s Mot. for Voluntary Dismissal, ECF No. 93.

Now before the court are cross-motions for summary judgment. Plaintiff seeks entry of judgment on his claims for unpaid wages under the DCWPCL, breach of contract, and retaliation under the DCWPCL. *See* Pl.'s Mot., Pl.'s Mem. in Supp. of Pl.'s Mot., ECF No. 117-1 [hereinafter Pl.'s MSJ], at 1. Defendants seek judgment in their favor on all claims and on their counterclaim

filed in the transferred *Novak Druce* matter.  *See* Defs.' Mem. in Supp. of Their Mot. for Summ. J. and Opp'n Resp. to Pl.'s Mot., ECF No. 148 [hereinafter Defs.' MSJ], at 39.  The parties also have filed various evidentiary motions, which the court addresses as part of the discussion below.

## III.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "genuine issue" is one as to which a reasonable factfinder could find for the non-moving party, and a fact is "material" only if it is capable of affecting the outcome of litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009).

The moving party bears the burden of establishing there is no genuine issue of material fact by pointing to evidence in the record.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The non-moving party must then point to "specific facts" in the record that would be admissible at trial indicating "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  The court must "eschew making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and must "view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party," *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotation marks omitted).

Where, as here, parties file cross-motions for summary judgment, the motions are viewed separately, in the light most favorable to the non-moving party, and the court must decide for each side whether the Rule 56 standard has been met.  *See Baylor v. Mitchell Rubenstein & Assocs., P.C.*, 857 F.3d 939, 952 (D.C. Cir. 2017).

## IV.    DISCUSSION

### A.    Defendants' Motion to Strike

Before reaching the merits, the court first considers Defendants' motion to exclude certain evidence: primarily Plaintiff's declaration and the declarations of two former Novak Druce lawyers, Jennifer Fraser and Alfred Zaher.  *See* Defs.' Motion to Strike and for Sanctions, ECF No. 145 [hereinafter Defs.' Mot. to Strike].[4]  The latter declarations address factors that Plaintiff believes establish Individual Defendants' personal liability for unpaid income under the DCWPCL.  *See* Pl.'s Mot., Ex. 3, ECF No. 117-6; Pl.'s Mot., Ex. 4, ECF No. 117-7.  Defendants contend that the court should disregard Plaintiff's declaration because it is undated and a "sham."  Defs.' Mot. to Strike at 1.  The Fraser and Zaher declarations should meet the same fate because Plaintiff disclosed those witnesses for the first time two years after the close of discovery.  *See id.* at 6, 15–16.

The court will not exclude Plaintiff's declaration.  Plaintiff originally submitted an undated declaration, but after Defendants brought the omission to his attention, he immediately sought leave to file a dated one.  *See* Pl.'s Subst.  The error was therefore harmless, and Defendants have not demonstrated otherwise.  *See* Fed. R. Civ. P. 37(c)(1).  Further, Plaintiff's declaration is not a "sham" warranting exclusion.  The "sham affidavit rule" "precludes a party from creating an issue of material fact by contradicting prior sworn testimony unless the shifting party can offer persuasive reasons for believing the supposed correction is more accurate than the prior testimony."  *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007) (internal quotation marks omitted).  The court has compared Plaintiff's declaration and his deposition testimony, and the former does not contradict the latter or introduce new information.  *See id.* at 1030

---

[4] The motion also seeks to exclude certain supplemental interrogatory responses, but their fate goes hand-in-hand with the challenged declarations.

("[T]he important considerations are whether the affidavit contradicts a prior sworn statement without justification or the filing party breached its obligations in discovery."). The court therefore will consider Plaintiff's dated declaration.

The court, however, will exclude the Fraser and Zaher declarations. Under Rule 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . , unless the failure was substantially justified or is harmless." Plaintiff does not dispute that he failed to identify Fraser and Zaher consistent with those rules. *See* Pl.'s Opp'n to Defs.' Mot. to Strike, ECF No. 155 [hereinafter Pl.'s Strike Opp'n], at 14–18. Instead, he attempts to justify the late disclosures or suggest they are harmless.

As to Fraser, Plaintiff notes that he partially disclosed her name in his first interrogatory answers and made Defendants aware that she was voluntarily producing documents. *See id.* at 15–16. But identifying Jennifer Fraser as "Frazer, Fraser" among a list of over 100 names is far from adequate notice. *See* Defs.' Reply to Pl.'s Strike Opp'n, ECF No. 160, at 7. Likewise, general notice that Fraser was sharing records is hardly a substitute for the substantive disclosure required under Rule 26. *See* Fed. R. Civ. P. 26(a)(1)(i) (requiring identification of "each individual likely to have discoverable information [ ] along with the subjects of that information"). Further, Defendants are plainly prejudiced, as they could have deposed Fraser but had no notice that she would have relevant information, let alone information critical to establishing Individual Defendants' liability under the DCWPCL.

A similar analysis applies to Zaher. Plaintiff never identified him as a witness in a timely interrogatory response, and Defendants are now prejudiced by that failure to disclose. Plaintiff's assertion that Defendants knew of Zaher because they themselves identified him in a discovery

7

response and Plaintiff initially noticed Zaher's deposition but then withdrew it, *see* Pl.'s Strike Opp'n at 16–17, does not relieve Plaintiff of his affirmative obligation to identify Zaher as a witness once he determined that Zaher had relevant information.  Rule 37(c)(1) therefore requires the exclusion of his declaration, too.  The court otherwise declines to impose any other form of sanction.

### B.      Breach of Contract Claim (Count II)

The court now turns to the merits, starting with Plaintiff's breach of contract claim against Novak Druce.  The parties assume that District of Columbia law applies, so the court does too. *See* Pl.'s MSJ at 10; Defs.' MSJ at 10.  To prevail on a breach of contract claim, a plaintiff must "establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Logan v. LaSalle Bank Nat'l Ass'n*, 80 A.3d 1014, 1023 (D.C. 2013) (internal quotation marks omitted).  Novak Druce argues that Plaintiff's claim fails because the parties did not come to a meeting of the minds on the material terms of an oral employment agreement in April 2015.  Defs.' MSJ at 10–11.[5]  Plaintiff, on the other hand, argues that there is no genuine dispute about contractual terms.  He points mainly to a September 2015 letter that Novak Druce sent to the U.S. Embassy in Mexico for the purpose of extending his employment visa.  Pl.'s MSJ at 5–7.  The letter explains Plaintiff's compensation as follows: "[a] portion of [the salary paid in 2015] [] reflects a percentage of collections payable as taxable wages (W2) which is how Mr. Arochi will be compensated going forward."  Pl.'s Mot., Ex. 18, ECF No. 117-21 [hereinafter Visa Ltr.], at 13, 23.  Plaintiff contends that this description confirms his view of the agreed-upon wage term.  *See* Pl.'s MSJ at 5–7.

---

[5] For reasons unknown to the court, Defendants argue that they did not breach earlier pay agreements covering April 2013 to March 2015.  Defs.' MSJ at 11–13.  Plaintiff alleges only breach of "a revised contract of employment with Novak-Druce in *April 2015*."  Am. Compl. ¶ 90. (emphasis added)

There is plainly a genuine dispute of material fact as to what Plaintiff would be paid in his third year of employment that precludes summary judgment for both sides. For starters, Plaintiff and Amernick have different recollections of the agreement. By Plaintiff's telling, Amernick offered to continue Plaintiff's employment, but his compensation would no longer be a fixed annual salary. Plaintiff understood getting 20% of "what we collect" to include then-outstanding fees from Veteria. Defs.' Stmt. of Material Facts in Supp. of Defs.' MSJ, ECF No. 149 [hereinafter Defs.' Stmt.], Ex. A, ECF No. 149-2, at 98:18–99:11, 103:16–106:16. Amernick, on the other hand, recalls that he told Arochi that "he would get future origination o[n] future matters that he brought in in which collections were made." Defs.' Stmt., Ex. K, ECF No.149-12, at 88:5-8. Such an arrangement would not include a share of outstanding Veteria fees. *Id.* at 88:9–11. This conflict is at the center of the dispute.

It is also reflected in the documentary evidence. For instance, a key internal communication suggests that the firm believed Plaintiff was entitled to a percentage of fees paid by Veteria *after* April 2015. On April 27, 2015, approximately two weeks after Amernick and Plaintiff discussed his employment status, Veteria began making outstanding fee payments. *See* Pl.'s Mot., Ex. 29, ECF No. 117-31. This set off an email exchange between Frank Stransky, the firm's CFO, and Individual Defendants concerning their "arrangement" with "respect to [Veteria] and Jose [Arochi]," with Stransky first asking Todd and Druce, copying Amernick, "Can you confirm what our arrangement is with respect to [Veteria] and Jose?" *Id.* at 3–4. Stransky later explained that he posed the question because "one comment noted that [Arochi] has been paid for the origination credit already" based on his receipt of a $145,000 annual salary—which is Defendants' litigation position in this case—but he (Stransky) "believe[d] [Arochi] is due the original credit for Veteria." *Id.* at 2. Neither Todd, Tracy, nor Novak (who was later added to the

9

email thread) questioned that conclusion.   And, importantly, Amernick *never* responded. Presumably, if as Defendants claim, Amernick and Plaintiff agreed to compensation based only on future originations, he would have said so.  Amernick's silence, along with the absence of any disagreement with Stransky's understanding, supports the existence of a genuine dispute about Plaintiff's compensation term.

So, too, does the fact that, after April 2015, the firm actually paid Plaintiff a percentage of the fees collected from Veteria.  *See* Ledger; *see also Steven R. Perles, P.C. v. Kagy*, 473 F.3d 1244, 1249–1250 (D.C. Cir. 2007) ("Another factor in determining intent to be bound is the parties' conduct *after* they reach an alleged oral agreement.").  An internal ledger shows that, from May 2015 through November 2015, Plaintiff received nearly $32,000 in compensation based in part on a 20% share of Veteria fees collections.  Ledger at 4.  That same record indicates that, as of December 2015, the firm owed Plaintiff a "Current Balance Due" of more than $108,000.  *Id.* The firm's continued and projected payment of a share of the Veteria fees after April 2015 could be viewed by a reasonable juror as supporting Plaintiff's account of his conversation with Amernick.

Defendants counter that these payments were made in error and that "Arochi knew the payments were made erroneously." *See* Defs.' MSJ at 26 & n.15.  But there is record evidence to the contrary.  The September 15 Visa Letter represented to the U.S. Embassy in Mexico that "[a] portion of [the salary paid in 2015] [] reflects a percentage of collections payable as taxable wages (W2) which is how Mr. Arochi will be compensated going forward."  Visa Ltr. at 13, 23.[6] Presumably, the firm would not have made this representation if it believed that Plaintiff was

---

[6] Defendants object to Arochi's reliance on the Visa Letter "to support [an] un-pleaded claim that the Visa Letter was a memorialization of a contract."  Defs.' MSJ at 34.  That argument is hard to follow.  Plaintiff does not assert any separate breach claim based on the Visa Letter.  Rather, he cites the correspondence to support his position that, in April 2015, the firm agreed to pay him a portion of unpaid Veteria fees.

erroneously paid a percentage of Veteria fees.  In any event, whether the firm erroneously paid Plaintiff is a disputed fact.[7]

Other records also can be read to support Plaintiff.  For instance, an email from Stranksy to Todd, copying Amernick, Novak, and Druce, on May 14, 2015, states: "Jose's check on the 7th was his final and he is now under a % deal."  Pl.'s Mot., Ex. 28, ECF No. 117-30.  The email does not specify whether that "% deal" covers only new originations but given that the firm paid Plaintiff a share of Veteria collections through the fall of 2015, a reasonable juror could read it to support his position.  Another example is Plaintiffs' inquiries made in December 2015 about outstanding compensation.  On December 21, 2015, Plaintiff sent separate emails to Novak and Druce asking about his share of Veteria fees because the client had paid.  Pl.'s Mot., Ex. 37, ECF No. 117-39.  Neither disabused Plaintiff of his belief he was owed a share of the Veteria collections.  Rather, Novak responded: "We will work through this and assure you faster than veteria."  *Id.* at 2.  Again, a reasonable juror could view this as proof that, in April 2015, Novak Druce had agreed to pay Plaintiff a percentage of Veteria collections.

Defendants do not grapple with any of this evidence.  Defs.' MSJ at 10–14.  Instead, they rely heavily on a single document reflecting meeting notes from a Workforce Review Committee recommending partner and employee compensation.  *See id.* at 13.  According to one former firm lawyer, Suni Sukduang, these recommendations were sent to the partnership for consideration.  Defs.' Stmt., Ex. R, ECF No.149-19, at 128:20–129:13.  The notes state: "Jose Arochi: 20% of future original collections.  No further salary."  Defs.' Stmt., Exs. L & P, ECF Nos. 149-13 & 149-

---

[7] Defendant's counterclaim seeking disgorgement of income rests on the premise that Novak Druce erroneously paid Arochi.  *Novak Druce* Compl. ¶ 27.  Because the facts underlying that claim are disputed, the court denies Defendants' motion for entry of judgment on its counterclaim.  *See* Defs.' MSJ at 39 (seeking entry a "money judgment in the amount of $29,000").

17. That record arguably supports Defendants' position. But it is just one document. It cannot carry Defendants to a judgment on a record that contains conflicting facts.

Defendants also argue that the arc of Arochi's compensation agreements can only be understood to have fully compensated him for the Veteria origination before April 2015. Defs.' MSJ at 12. Recall, in his second year, Plaintiff went from a hybrid salary and commission compensation scheme to a fixed annual salary of $145,000. According to Defendants, "Arochi's vested rights to any Veteria collection of fees under the offer letter were mutually terminated and replaced with a salary of $145,000." *Id.* Maybe so. But Defendants point to no undisputed evidence to establish such an arrangement, only their one-sided view of events. *See id.* (citing Defs.' SMF ¶¶ 95, 96, 97, which largely cite to individual Defendants' testimonies). Indeed, there is contrary evidence. *See supra* Section IV.B (discussion of April 27 email). A jury will have to decide which view prevails.

Defendants also argue that this case is controlled by the D.C. Circuit's decision in *Perles*, in which the court held that a junior lawyer had not sufficiently shown that she had reached an oral agreement with the law firm's sole owner to pay her a share of an anticipated contingency fee. *See* Defs.' MSJ at 10–11, 14; *Perles*, 473 F.3d at 1249–1251. In *Perles*, the court concluded that the counterclaim-plaintiff had not proven the existence of an enforceable oral contract because the trial evidence (1) established the "parties clearly contemplated a written contract," (2) "[did] not reveal *any* conduct of the parties after the May 1997 conversation that supports [the counterclaim-plaintiff's] assertion that they created a binding contract in that conversation," and (3) "the potentially large fee award"—millions of dollars—"suggests that [the two lawyers] did not intend to be bound by their oral conversation." *Id.* The court further held that, even if the parties had intended to be bound, the claim still failed because two essential material terms were missing from

12

the agreement: "how *long* [the counterclaim-plaintiff] would have to work on the case to obtain [a share of the contingency fee]" and "what *kind* of work she would have to do earn such a potentially massive payment." *Id.* at 1252.

The facts here are starkly different. There is no evidence that the parties contemplated a written agreement in lieu of an oral one. There is ample conduct by Defendants suggesting that they intended to be bound by the oral contract, perhaps none more significant than paying Plaintiff consistent with that agreement. And the amount at issue is not so large that the parties likely did not intend an oral contract. Further, the material terms of the agreement are in place: Plaintiff would continue working for Novak Druce in the same capacity, and his compensation would be a 20% share of the fees collected from client originations. That the parties dispute whether this agreement applied to outstanding Veteria fees does not mean the oral contract lacked material terms. It just means that the trier of fact will have to decide what was encompassed within those terms.

On this contested record then, the court cannot enter judgment in favor of either side on Plaintiff's contract claim.

### C.    D.C. Wage Protection and Collection Law Claim (Count I)

#### 1.    *The Claim's Merits*

Plaintiff also seeks unpaid compensation under the DCWPCL. Am. Compl. ¶¶ 77–88. That claim rests on the same evidence as his contract claim. So, too, does Defendants' factual defense. Insofar as the parties contest whether Plaintiff is owed compensation at all, judgment is not warranted on the DCWPCL claim for the reasons already discussed.

Defendants also offer a legal defense. They argue Plaintiff cannot recover under the DCWPCL because his claim stems from work that occurred prior to February 2015, a time when

13

professionals, such as lawyers, were not covered by the Act.  *See* Defs.' MSJ at 6–9.  But this argument misconstrues Arochi's wage claim.  Under the DCWPCL, a plaintiff can sue for "[t]he payment of any back wages unlawfully withheld."  D.C. Code § 32-1308(a)(1)(A)(i).  The term "wages" expressly includes "[c]ommission[s]."  *Id.* § 32-1301(3)(B).  Plaintiff's claim is that, after November 2015, Novak Druce "unlawfully withheld" "back wages" earned from the Veteria fee receipts, which the firm orally had promised to pay in April 2015.  Thus, under Plaintiff's theory, the firm's obligation to pay wages under the DCWPCL arose *after* February 2015.  Therefore, the parties' wage dispute arose when Arochi was a covered employee.

This conclusion also settles Defendants' argument that Plaintiff is not covered by the DCWPCL because he did not live in the District of Columbia when the firm agreed to pay him a percentage of originated client fees.  *See* Defs.' Reply Mem. in Supp. of Their. Mot. for Summ. J., ECF No. 161, at 4.  April 2015 is the relevant time because that is when the parties agreed to extend Plaintiff's employment.  There is no dispute that Arochi worked in the District at that point. *See* Am. Compl. ¶ 14; Defs.' Answer to Am. Compl., ECF No. 37, ¶ 14 (admitting that Plaintiff worked in the D.C. office after June 2014).  He thus was protected by District law.

### 2.    Individual Defendants' Liability

Plaintiff seeks to hold not only Novak Druce liable for unpaid wages but Individual Defendants as well.  Pl.'s MSJ at 25–42.  Because Plaintiff has not offered sufficient facts to create a genuine dispute as to whether Individual Defendants had "operational control" over the firm, the court enters judgment in their favor as to the DCWPCL claim.

The D.C. Court of Appeals has recognized that an individual owner or corporate officer can be held responsible for unpaid wages under the DCWPCL.  In *District of Columbia v. Bongam*, the court affirmed a trial judgment finding the defendant-company's CEO, Bongam, qualified as

an "employer" under § 32-1301(1B) of the DCWPCL. 271 A.3d 1154, 1157 n.1 (D.C. 2022). The court pointed to the following facts to support that finding: Bongam "(1) was the CEO, (2) was a majority shareholder and registered agent, (3) known by the claimants as 'boss,' 'owner,' or 'director,' (4) controlled almost all aspects of the business, and (5) and as some employees testified, was personally involved in resolving wage payment issues by compensating them in cash." *Id.*

As legal support, the court cited solely to *Ventura v. Bebo Foods, Inc.*, 738 F. Supp. 2d 1 (D.D.C. 2010), describing *Ventura* as "holding that under the totality of the circumstances, a corporate officer can be an 'employer' if they have operational control over the corporation." *Bongam*, 271 A.3d at 1157 n.1. In *Ventura*, the court applied a so-called "economic reality test," which requires courts to consider the "totality of the circumstances of the relationship between plaintiff/employee and defendant/employer to determine whether the putative employer has the power to hire and fire, supervise and control work schedules or conditions of employment, determine rate and method of pay, and maintain employment records." 738 F. Supp. 2d at 5 (internal quotation marks omitted). Those factors "plus the ownership interest of the corporate officer" determine "whether a corporate officer has operational control." *Id.* at 5–6. Applying those principles, the court in *Ventura* found a restaurateur personally liable for unpaid wages. It noted that the restaurateur was the "president and sole owner" of the two defendant-companies; "had the power to hire and fire, control work schedules and supervise employees"; and "determine[d] pay rates, and maintain[ed] employment records." *Id.* at 6. The evidence also showed that the restaurateur transferred employees between restaurants; took part in hirings; approved full wage payments, partial payments, or nonpayment as financial circumstances allowed; and exerted direct supervision over the plaintiffs at the restaurants. *Id.*

15

The court has detailed the facts of *Bongam* and *Ventura* to illustrate how sharply they diverge from those here.[8]  Start with ownership interest.  According to Plaintiff, no individual partner had more than a 10% equity share of the firm.[9]  That is a far cry from the "majority" shareholder in *Bongam* or the "sole owner" in *Ventura*.  Further, unlike in those cases, no Individual Defendant had final say over major decisions.  The ownership and management of Novak Druce was governed by a nearly 60-page partnership agreement.  Defs.' Stmt., Ex. Z, ECF No. 149-27 [hereinafter Partnership Agreement].  The firm operated through a committee structure.  Pl.'s SMF ¶¶ 183–188.  Key administrative bodies included the Management Committee, Executive Committee, Compensation Committee, Associate Compensation Committee, and an ad hoc Working Group formed when the firm faced financial distress.  *Id.*; Partnership Agreement ¶¶ 3.12, 5.4, 5.13.  Multiple firm partners occupied management roles, including Managing Partner, Executive Partner, Administrative Partner, Local Office Administrative Partners, and Practice Group Leaders.  Pl.'s SMF ¶¶ 189–192; Partnership Agreement ¶¶ 3.3–3.11.  Individual Defendants occupied many of these roles: Novak was the Managing Partner and on the Executive Committee, Defs.' SMF ¶ 219; Amernick and Druce were co-Executive Partners and on the Executive Committee, *id.* ¶¶ 215, 217; and Todd was the Administrative Partner, *id.* ¶ 221.  But all "Major Decisions," as defined in the Partnership Agreement, required a majority vote of all equity partners for approval.  Partnership Agreement ¶ 3.18.  That included the admission of new equity and non-equity partners; expenses greater than

---

[8] Plaintiff leans heavily on the Fraser and Zaher Declarations to establish individual Defendants' operational control of the firm.  *See, e.g.*, Pl.'s MSJ at 33, 37; Pl.'s SMF ¶¶ 216–219, 231–233, 237–238, 279–284, 315–320.  For the reasons discussed, the court has not considered those submissions.

[9] Plaintiff's representations about number of partners and ownership percentages are muddled.  Pl.'s MSJ at 37 & n.30 (citing Exhibit 44).  They rest on solely "Ex. 44," which he identifies as Defendants' supplemental interrogatory responses.  *Id.*  But Exhibit 44 is a demand letter from Plaintiff's counsel, not discovery responses.  Pl.'s Mot., Ex. 44, ECF No. 117-46.  Still, the court uses the 10% figure cited by Plaintiff because even this high-end figure cuts against individual liability.

$250,000; incurring debt; and the use of partnership assets for personal business activities.  *See id.*

Compensation for partners and non-equity partners likewise had to be approved by a majority vote

of the Executive Committee and equity partners.  *Id.* ¶ 5.4.[10]  As for associates, their compensation

was recommended by an Associates Compensation Committee and "confirmed by the Executive

Committee."  *Id.* ¶ 5.13.  The Partnership Agreement thus did not permit any individual partner to

exercise the type of "operational control" comparable to that found in *Bongam* and *Ventura*.

Plaintiff disputes none of this.

The "economic reality" factors likewise confirm the absence of such "operational control."

As for the first factor, the power to hire and fire, Plaintiff offers a smattering of purported facts

that rests mainly on the late-presented, and now excluded, Fraser Declaration, leaving the record

muddled.  Pl.'s MSJ at 26 (cross-referencing Pl.'s SMF); Pl.'s SMF ¶¶ 216–234.  The Partnership

Agreement, however, is clear.  Associate and non-equity partner hiring and firing was vested in

"the Management Committee with the concurrence of a majority vote of the Executive

Committee."  Partnership Agreement ¶ 3.16.  Arochi notes that some combination of Novak,

Druce, and Todd interviewed him before he received an offer of employment as a "Foreign

Associate," Pl.'s SMF ¶ 226; Defs.' SMF ¶ 3, but that is hardly remarkable.  Law firm partners

routinely interview prospective associate candidates, but that does not mean they have the power

to unilaterally hire new lawyers.  Even as to him, Arochi offers no proof that he was hired without

requisite firm approvals.

As to the next factor—supervision and control of work schedules or conditions of

employment—Plaintiff has presented no evidence that any Individual Defendant controlled the

---

[10] Plaintiff asserts that Novak Druce allocated firm profits based on a formula "unrelated" to equity ownership percentage.  Pl.'s MSJ at 37.  He does not explain why that matters.  What is key is that Individual Defendants had to share profits with other partners, and none could set his own annual compensation.

day-to-day work of firm lawyers. *See* Pl.'s MSJ at 26–29. That is not surprising. Novak Druce was not a solo or small law practice where one might expect a single lawyer to assign and supervise client work. *Cf. Perles*, 473 F.3d at 1246–47 (describing solo firm practitioner). Its size meant that such control did not rest with any one partner. With respect to Plaintiff himself, he describes his work as largely unstructured and focused mainly on business development. Pl.'s SMF ¶¶ 241–245. Plaintiff admits that he "had no fixed work schedule" and did not "keep time records for client origination work." *Id.* ¶¶ 242, 245. He further concedes that, before April 2015, he "was supervised" not by any Individual Defendant but by two other Novak Druce partners, Fraser and Katie Basile. Defs.' SMF ¶¶ 37–38 (Pl.'s Resp). True, Plaintiff may have reported to an Individual Defendant from time to time about his business development and collection efforts, Pl.'s SMF ¶¶ 261–262, including "organizing the attendance of the Partners at [intellectual property law] conferences," *id.* ¶¶ 243, 246–247. But he cites no evidence that any Individual Defendant regularly assigned him client work (in fact, he did very little of it, *id.* ¶ 244) or directed his business development efforts. That comes nowhere close to the type of comprehensive supervision and control over employees' work possessed and exercised by the business owners in *Bongam* and *Ventura*.

With regard to the third factor, establishing the rate and method of payment of associates like Plaintiff, no Individual Partner had such authority. As discussed, under the Partnership Agreement, the Associates Compensation Committee had the responsibility of recommending associate salaries to the Executive Committee for approval. *See supra* Section IV.C.2 (discussing approval of associate compensation). With respect to his own circumstances, Plaintiff offers no proof that any Individual Defendant or group of them had the final say as to his compensation arrangements. Indeed, the evidence is ambiguous or to the contrary. Plaintiff points to an email

18

among Todd, Novak, and Druce regarding his offer letter, Pl.'s SMF ¶ 287 (citing Pl.'s Mot., Ex. 20, ECF No. 117-23), but that exchange sheds no light on who proposed or approved the initial compensation term.  The Management Committee approved his fixed salary during his second year, and that committee included at least one partner not named as a defendant (Bill McShane). *Id.* ¶ 288.  And the disputed third-year compensation term was part of a larger discussion by an ad hoc committee about cost-cutting, although the parties dispute whether the full partnership voted on its recommendations.  Defs.' SMF ¶¶ 118–119; Pl.'s Mot., Ex. 21, ECF No. 117-24.  Plaintiff therefore has failed to show that any Individual Defendant exercised exclusive control over his compensation.

As for the last factor, Plaintiff has presented no evidence that any Individual Defendant, as opposed to the firm itself, maintained employment records.  *See* Pl.'s MSJ at 30–31.

In sum, the uncontested facts establish that no Individual Defendant had "operational control" of Novak Druce in a manner comparable to the business owners found personally liable in *Bongam* and *Ventura*.  The court therefore will enter summary judgment in favor of Individual Defendants on Plaintiff's DCWPCL claim.

### D.    Fraud Claim (Count III)

Next, the court considers the fraud claim and grants summary judgment in favor of Defendants.  Under District of Columbia law, claims for fraud and breach of contract must rest on distinct predicates, yet here they are inextricably intertwined.  *See Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008) ("[T]he tort must exist in its own right independent of the contract, and any duty upon which the tort is based must flow from considerations other than the contractual relationship.").

19

Plaintiff maintains that the "allegations supporting the fraud claim" are different because "[f]raudulent intent may be inferred from the circumstances that are evidenced in this record." *See* Pl.'s Reply in Supp. of Pl.'s Mot., ECF No. 156, at 20.  That argument is hard to discern. He points to a single email from Novak on December 22, 2015, in which Novak assures him that "[w]e will work through this," referring to the unpaid Veteria compensation.  *Id.* (citing Pl.'s Mot., Ex. 36, ECF No. 117-38).  But a promise to make good on an alleged contractual term does not give rise to a separate fraud claim.  His fraud claim therefore fails.

### E.    Retaliation Claim (Count IV)

Plaintiff's retaliation claim under the DCWPCL stems from the lawsuit that Defendants filed against him in federal court in Texas after he made a demand for unpaid wages.  Am. Compl. ¶¶ 103–110.  Defendants offer a variety of reasons for entering judgment in their favor, but their arguments lack merit.

First, they contend that Plaintiff has no cognizable retaliation claim under the DCWPCL because it "stems from work prior to February 26, 2015," when the statute's protection did not cover legal professionals.  Defs.' MSJ at 16.  But the relevant time is not when the work was performed, but rather when Plaintiff engaged in protected activity.  *See* D.C. Code § 32-1311(a)(2) (making it unlawful for an employer to retaliate against an employee or person who "[i]nitiated or is about to initiate a proceeding under or related to this chapter").  Here, that occurred in September 2018, long after legal professionals received protection under the statute.

Second, Defendants contend that the DCWPCL does not supply Plaintiff a retaliation claim because he was a former employee at the time of the alleged retaliatory act.  *See* Defs.' MSJ at 17. But the plain statutory text forecloses that argument.  The DCWPCL extends protection against

20

retaliation to "any employee *or* person." D.C. Code § 32-1311(a) (emphasis added). A former employee is obviously a "person."

Third, Defendants maintain that, because their filing in Texas was merely a declaratory judgment action, it would not have dissuaded a reasonable person from exercising their statutory rights and therefore was not retaliatory. Defs.' MSJ at 17. That argument, however, mischaracterizes their own suit. Defendants did not merely ask the Texas court to determine whether they owed Plaintiff unpaid wages. They also demanded "declaration[s]" of disgorgement of "amounts of overpaid compensation," *Novak Druce* Compl. ¶ 33, and "damages as a result of Defendant's abuse of process," *id.* ¶ 34, as well as an "appropriate award to compensate [Defendants] for the harm [they have] been caused by [Plaintiff]," *id.* at ¶ 36. Seeking repayment of thousands of dollars[11] and an unspecified award for "damages" and "harm" is the kind of suit that would deter a reasonable person from engaging in protected activity. That conclusion is consistent with those decisions holding that a lawsuit filed "with retaliatory motive and without any reasonable basis in fact or law" qualifies as an adverse action. *Darveau v. Detecon, Inc.*, 515 F.3d 334, 341, 343 (4th Cir. 2008) (citing *Bill Johnson's Rests. v. NLRB*, 461 U.S. 731, 744 (1983) (Fair Labor Standards Act (FLSA) retaliation claim)); *see also Melendez v. Poy Loung DC Grp., LLC*, No. 17-cv-370 (CKK), 2018 WL 4637007, at *11–12 (D.D.C. Sep. 27, 2018) (citing *Darveau* and its possible application to a DCWPCL retaliation claim but ultimately not deciding).[12]

Finally, Defendants make two confounding arguments asserting that the retaliation claim is no longer live. They contend that the judge in Texas implicitly determined that the suit was not

---

[11] At least in terms of deterrent effect, the court discerns no difference in Defendants' demand for "declaration[s]" of disgorgement and damages and an entry of judgment for such monetary awards.

[12] Defendants do not argue for summary judgment based on a lack of retaliatory motive or that their preemptive suit had a basis in fact and law. See Defs.' MSJ at 16–20. So, the court does not address those grounds.

retaliatory because otherwise he would not have transferred it. *See* Defs.' MSJ at 19. The Texas federal court, however, said not a word about the merits of Defendants' case. A transfer order cannot be read as a silent imprimatur of a suit's propriety. Defendants also argue that the retaliation claim has been "dismissed" because the Polsinelli law firm "filed the Texas action" and Plaintiff has settled with Polsinelli. *See id.* at 19–20. But the dismissal of Polsinelli did not extinguish the retaliation claim against Novak Druce and Individual Defendants, all of whom were plaintiffs in the Texas case. *See* Order Granting Voluntary Dismissal of Plaintiff's Claims Against Defendant Polsinelli PC, ECF No. 95. Polsinelli's settlement therefore is simply irrelevant.

Turning now to Plaintiff's motion, the court easily denies it for two reasons. *See* Pl.'s MSJ at 19–24. For one, Plaintiff has not established beyond dispute that the but-for cause of Defendants' first-filed suit was to retaliate against him for engaging in protected activity under the DCWPCL. *Cf. Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1343 (11th Cir. 2000) (adopting but-for causation for retaliation claim under the FLSA); *Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 580 (5th Cir. 2004) (same). Plaintiff relies on the Texas complaint as proof of motive. *See* Pl.'s MSJ at 20. Yet, on its face, the pleading provides a legitimate, non-retaliatory reason for filing suit: to protect their reputations and preempt the negative media attention threatened by Plaintiff if they did not settle. *Novak Druce* Compl. ¶ 29 ("Finally, [Arochi], through counsel, threatened to go to Law360, a legal industry trade press publication, with the filed complaint expecting negative PR for [Defendants], as well as their new employer as leverage to get paid. Plaintiffs therefore file this Complaint for Declaratory Relief."). In addition, Plaintiff has not demonstrated that the Texas suit lacked any factual or legal basis. *See* Pl.'s MSJ at 22–24 (arguing that Defendants' "theory of the case is so absurd that it cannot have been advanced in good faith"). That conclusion follows from this court's rejection of Plaintiff's insistence that he is entitled to

judgment on his breach of contract and wage claims.  His motion for summary judgment as to retaliation therefore is denied.

### F.  Unjust Enrichment Claim (Count VI)

That leaves Arochi's unjust enrichment claim.  *See* Am. Compl. ¶¶ 116–121.  Typically, a claim for unjust enrichment will not go forward if there is a valid contract "governing an aspect of the [parties'] relation," because "a court will not displace the terms of that contract and impose some other duties not chosen by the parties."  *Emerine v. Yancey,* 680 A.2d 1380, 1384 (D.C. 1996).  On the other hand, when the contract is not valid or fails to cover the dispute, its existence does not foreclose recovery based on an unjust enrichment claim.  *See Armenian Assembly of Am., Inc. v. Cafesjian,* 597 F. Supp. 2d 128, 135–36 (D.D.C. 2009).  Here, the undisputed facts establish that Plaintiff and Novak Druce reached an oral agreement in April 2015 to continue his employment.  The only question is its compensation term.  The existence of an oral contract that encompasses the parties' dispute therefore forecloses the unjust enrichment claim.

## V.  CONCLUSION

For the reasons explained, the court rules as follows on the parties' motions:

(1)  Plaintiff's Motion for Summary Judgment, ECF No. 117-1, is denied as to his claims and Defendants' counterclaim;

(2)  Defendants' Motion for Summary Judgment, ECF No. 146, is granted in part and denied in part.  Judgment is entered in favor of all Defendants as to Plaintiff's fraud and unjust enrichment claims and in favor of Individual Defendants on Plaintiff's DCWPCL claim but is otherwise denied as to Plaintiff's remaining claims and Defendants' counterclaim;

(3)  Defendants' Motion to Strike, ECF No. 145, is granted in part and denied in part;

(4)    Plaintiff's Motion to Substitute a Dated Version of Plaintiff's Declaration, ECF No. 154, is granted;

(5)    Plaintiff's Motion to Strike, ECF No. 163, is denied; and

(6)    Plaintiff's various sealing motions, ECF Nos. 111, 119, and 120, are denied. Plaintiff has not justified the sealing of any portion of his briefs or exhibits under the *Hubbard* factors, let alone the filing in its entirety.  The Clerk of Court shall unseal ECF No. 117, including all exhibits, in its entirety.

Dated:  June 29, 2026

Amit P. Mehta
United States District Judge

24